UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

KIM LAVIGNE,

                Plaintiff,

v.                                               Case Number: 09-10146-BC
                                               Honorable Thomas L. Ludington

DOW CHEMICAL, INCORPORATED,

                Defendant.

_____/

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Kim Lavigne filed a complaint against Defendant Dow Chemical, Incorporated[1] on January 13, 2009, alleging claims for discrimination because of her gender in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e, and the Elliott-Larsen Civil Rights Act ("ELCRA"), Mich. Comp. Laws §§ 37.2101–.2804, and for retaliation in violation of Title VII, ELCRA, and the Michigan Worker's Disability Compensation Act ("WDCA"), Mich. Comp. Laws §§ 418.101–.941. The complaint alleges that she began work as a chemical process operator in Defendant's Midland, Michigan plant on August 15, 2007, and was terminated on March 12, 2008 because she was a woman who had complained about mistreatment and exercised her rights to disability compensation under the WDCA. Defendant's answer [Dkt. # 4] admits that Plaintiff worked at its Midland plant for about seven months. Defendant denies that Plaintiff's employment was terminated because of her gender, terminated in retaliation for taking WDCA leave, or terminated for reporting gender discrimination.

Following the close of discovery, Defendant filed a motion for summary judgment on

---

[1] Should be "The Dow Chemical Company."

February 19, 2010. Defendant contends in the motion that the decision to terminate Plaintiff's employment was made for legitimate, nondiscriminatory reasons. Defendant further contends that Plaintiff's work environment was not hostile to women, and that the decision to terminate her employment was not made in retaliation for her gender discrimination complaints or her use of WDCA leave. Indeed, according to Defendant, Plaintiff never received workers compensation benefits under the WDCA in the first place.

Plaintiff filed a brief [Dkt. # 37] in opposition to Defendant's motion for summary judgment on March 12, 2010. Plaintiff's brief includes a lengthy description of the facts she believes support her claims. Plaintiff also responds that she did in fact exercise her right to workers compensation under the WDCA, and she was terminated by Defendant in retaliation for exercising those rights. Plaintiff further asserts that she was treated differently than similarly situated male employees, and subjected to a hostile work environment on the basis of her gender. Ultimately, Plaintiff contends, her employment was terminated because of her complaints about gender discrimination and her exercise of WDCA rights.

The parties papers sufficiently describe the factual and legal issues necessary for determination of the motion, and the hearing initially scheduled for April 19, 2010 was canceled. E.D. Mich. L.R. 7.1(f)(2). For the reasons set forth in this opinion, Defendant's motion is **GRANTED IN PART AND DENIED IN PART**. Plaintiff's discrimination claims and WDCA retaliation claim will be **DISMISSED WITH PREJUDICE**, but material issues of fact remain as to Plaintiff's Title VII hostile work environment claim and Title VII and ELCRA retaliation claims.

# I

The relevant facts, viewed in the light most favorable to Plaintiff, are described in detail in Plaintiff's complaint and excerpts from eleven deposition transcripts and other documents attached to the parties' papers. Plaintiff was hired in August 2007 as part of the "Fast Start" program and began training as a chemical process operator. She was eventually assigned to Defendant's latex plant in Midland. Pl.'s Dep. at 13. The Fast Start training was designed to last three months, and required employees to begin with two weeks in the plant, followed by eight weeks of "book study," including several tests. Pl.'s Resp. at 4; [Dkt. # 37]. Plaintiff completed the "Fast Start" portion of the training, passing all the tests, and was assigned to the latex facility in Midland along with fellow trainee Mike Monville, who started the "Fast Start" program at the same time as Plaintiff. *Id.*

When Plaintiff began at the latex plant, she was instructed to spend fifty percent of her time studying documents and instruction manuals and the other fifty percent of her time training on-the-job with her assigned trainer. *Id.*; Pl.'s Dep. at 21. Monville was assigned the same mix of classroom and on-the-job training at the latex plant. Pl.'s Dep. at 23. Plaintiff understood that Defendant expected her to complete the classroom portion of the training by August 2008, which included "hundreds" of different subjects and tests. Pl.'s Dep. at 25. For the on-the-job portion of her training, Plaintiff was initially assigned to work with Lance Williams, running a 15,000 gallon chemical reactor. Monville was assigned to a different trainer.

Kristie Murray, the only other woman working in the latex plant, was also in the training process and was assigned to train with Williams and Plaintiff. Pl.'s Dep. at 29. Murray started working for Defendant sooner than Plaintiff, but Murray was apparently having some difficulty completing the training process. Plaintiff stated at her deposition that she understood from Rick

Lombardi, the head of the latex plant, that she was assigned to train with Williams and Murray in part because of Murray's difficulties. Pl.'s Dep. at 29. Plaintiff stated that Lombardi told her "we feel you came from the [United Auto Workers], you can handle these guys. These guys have been rejecting girls for years."[2] Pl.'s Dep. at 29. Plaintiff believed she was paired with Williams and Murray with the hope that Murray would finally be able to complete the training program. Pl.'s Dep. at 29–30. Murray has since been reassigned and no longer works in the latex plant.

From the beginning, Williams did not want to train Plaintiff. Pl.'s Dep. at 29–36; Williams Dep. at 18, 25; Gwizdala Decl. ¶ 2. Plaintiff asserts that he did not want to train her because she was a woman. She stated at her deposition that he would not train her:

> Because females can't do the physical capabilities of the job he said, and that he wasn't going to waste his time with another female. He already wasted eight months with Kristie, he said, and he wasn't going to waste no more time with me. He said that I can follow him around, but not to ask any questions[.]

Pl.'s Dep. at 30. Defendant, by contrast, contends Williams was simply "burned out" on training. Williams Dep. at 18, 25; Gwizdala Decl. ¶ 2. Williams stated during his deposition that he did not "refuse" to train plaintiff, but he did "request . . . to stop training personnel for awhile because I had just gotten burnt out on training people." Williams Dep. at 18.

Two weeks into Plaintiff's training at the latex plant, Williams stopped acting as her trainer. Lombardi directed Plaintiff to focus on the book-work aspect of her training until a new trainer could be found. Pl.'s Dep. at 42–43. Plaintiff indicated that it took between two and three-and-a-

---

[2] Defendant contends that this evidence should be disregarded because it is hearsay. However, to the extent in tends to show Plaintiff's perception of the work relationships at the plant and the way she was received by her coworkers, it is admissible. It may not, however, be admissible to demonstrate that the male workers in the latex plant had been "rejecting girls for years." *See* Fed. R. Evid. 801(c), 802.

half weeks to find a new trainer, during which time she completed two of the three books required for the classroom training. Pl.'s Dep. at 43. After the period without a trainer, Plaintiff resumed on-the-job training when new trainer Jeff Shannon was transferred from the evening shift to the day shift to facilitate her continued training. Pl.'s Resp. at 10–11. Shannon was an experienced supervisor with other companies, but Plaintiff was the first person he trained at Dow's Midland facilities.

Despite early difficulties finding a permanent trainer, Plaintiff's classroom training proceeded according to the schedule set by Defendant. On January 8, 2008, Steven Robb, a supervisor in the latex plant, sent Plaintiff an e-mail indicating her "progress [was] on track for successful completion of" the book-work portion of the training. [Dkt. # 37-10]. At that same time, however, Plaintiff's supervisors and trainers were growing concerned about her progress toward completion of the on-the-job portions of the training. Shannon, who had been working with Plaintiff for about six weeks, met with Robb on January 10, 2008 and explained that he was concerned about Plaintiff's ability to pay attention and get along with other operators. Shannon also told Robb that he was frustrated with her lack of interest in learning the job. Gwizdala Decl. ¶ 4; Shannon Dep. 98–100; Robb Dep. 14–15, 47–49. Shannon and Robb planned to meet with Plaintiff during her next shift to discuss their concerns about her training progress. The January 10 meeting was the first time that Robb was made aware of any performance issues regarding Plaintiff. Robb. Dep. at 15. His meeting notes reflect the concerns expressed by Shannon during the meeting. *Id.* Ex. 49.

On the same day that Robb and Shannon met to discuss Plaintiff's on-the-job training, Plaintiff was exposed to recycled oil when it leaked from a pipette onto her arm. Pl.'s Dep. at 69–73. Plaintiff, wearing gloves and safety goggles, removed oil from the reactor into a small jar,

carried the jar to a ventilated testing hood, and proceeded to remove some oil from the "little jar" with a pipette and insert it into the "little tiny, tiny vial" used to test the oil. *Id.* at 70–71. When she attempted to transfer the oil from the pipette to the vial, some of the oil "squirted" on her forearm and ran down underneath her glove onto her hand. *Id.* at 71–72. After she was exposed to the oil, she immediately removed her glove, went to the sink, and began to run water over the exposed area. *Id.* at 72–75. She immediately called for help from Shannon, who was nearby, but he did not assist her or call for help. *Id.* Steve Blair, the lead operator on the shift, came to her aid "right away." *Id.* at 75–76.

Blair directed Plaintiff to flush the area for twenty minutes with water, instructed her that calling for an ambulance would be unnecessary because employees in the latex plant "get that stuff on us all the time," and told her to finish her shift. *Id.* at 76. Blair's decision to forgo calling an ambulance was contrary to Defendant's policies. Initially, Plaintiff was fine, but by the end of her shift one hour later she was beginning to feel "a little bit dizzy." *Id.* Plaintiff went home and slept for twenty-four hours. *Id.* at 83–84. She woke up the next day feeling ill. Her symptoms included low blood pressure and heart rate, slurred speech, fatigue, congestion, cough, dizziness, and swollen glands. *Id.* at 83–86; Gratiot Medical Center Patient Visit Record; [Dkt. # 31-B]. Two days later, Saturday, January 12, 2008, Plaintiff called her supervisors and informed them she was too ill to come to work. She went to the emergency room instead. [Dkt. # 31-B & C]. The medical records indicate a probable diagnosis of a sinus infection or "viremia," referring to the spread of a virus through a person's bloodstream. The medical records do not mention chemical exposure as a possible cause of the illness.

On January 15, 2008, Plaintiff contacted nurse Charlotte Atton, an employee in Defendant's

medical department, and indicated she had been exposed to recycled oil and believed it to be the cause of her illness. Pl.'s Resp. at 15. On January 17, 2008, Plaintiff called Brian Vallieu, an employee in the latex plant who had recently become Plaintiff's direct supervisor, and informed him of her illness and her belief that it was caused by exposure to recycled oil. *Id.* Plaintiff was cleared by the nurse and returned to work halftime on February 4, 2008. Pl.'s Dep. Ex. 3. The day she returned, she met with Robb to discuss her training issues, issues related to her exposure to chemicals, the cause of her illness, and problems with unfair treatment by male employees. [Dkt. # 37-14]. She told Robb that she was "always exposed to chemicals" and that she believed chemical exposure had caused her illness. She also told Robb that she believed she was being singled out and mistreated by male employees, citing as examples Williams' refusal to train her because she was a woman; her reassignment to Shannon, who was an inexperienced trainer; Lombardi's comments about the difficulty women had experienced at the plant in the past; and generally rude behavior from the male employees at the plant. Among other instances, Plaintiff asserts that both she and the only other female employee in the plant were called a "bitch" and belittled for being "on the rag." That employee, Murray, agreed that the treatment was rude, but suggested it was directed at new employees generally, and not at women in particular. Murray Dep. at 15–17.

Shortly after returning to work, Plaintiff also met with Vallieu and a safety expert to discuss the oil spill, and to look for solutions to guard against future spills. Vallieu Dep. at 70–71. Plaintiff reiterated during the meeting that she was repeatedly exposed to chemicals while working in the latex plant. *Id.* As a result of the investigation into the oil exposure, Blair was disciplined for not calling an ambulance after Plaintiff was exposed to the oil. *Id.* at 58–59. For his part, Vallieu expressed concerns that repeated exposure might indicate Plaintiff was not performing tasks in

accordance with the recommended procedures, creating dangerous situations that could be avoided. Vallieu Decl. ¶¶ 2, 6, 7.

On February 12, 2008, Vallieu also followed up on an e-mail Plaintiff had sent to her previous supervisor, Lombardi, on January 7, 2010. Pl.'s Dep. Ex. 2. In the January e-mail, Plaintiff expressed concerns about the capacity of a hoist used to move "MAM bags" in the plant. *Id.* She stated that the hoist was rated at "2000lb max and the mam bags are 2000lbs or better[.]" *Id.* Lombardi instructed a third employee to look into the issue, and praised Plaintiff for noticing the potential problem. The third employee replied on January 8, 2008, indicating the bags were labeled at 520 kilograms, which is about 1,150 pounds. Accordingly, the hoist had ample capacity. Vallieu's February 12 e-mail explained that the hoist had plenty of capacity for the "MAM" bags and encouraged Plaintiff to continue to be vigilant and make safety "observations." Vallieu Dep. Ex. 26. But the e-mail also directed Plaintiff to work toward becoming "an active part of the solution" as well. *Id.* Vallieu's e-mail encourages Plaintiff to move beyond pointing out hazards to her supervisors, and become part of the mitigation process. "Please feel empowered to initiate action to correct [a safety] issue in the plant yourself." *Id.*

Vallieu sent a second e-mail on February 19, 2008 concerning her recent training performance, particularly the completion of certain classroom work and her preparedness for a recent on-the-job "skill check." Pl.'s Dep. Ex. 6. The e-mail indicated Vallieu expected Plaintiff to know the material before the skill checks and "share" her knowledge with the reviewer during the exercise. "The discussion we had this morning was just the opposite." *Id.* The e-mail directed Plaintiff to be better prepared for future skill checks. The e-mail also referenced certain "MOD computer" training plaintiff was scheduled to complete in December, and directed her to complete

the training as soon as possible.

Plaintiff asserts that the February e-mails are evidence that Vallieu had singled her out because she was a woman, and was in the process of building a record of misconduct and error in an effort to make the case for terminating her employment. Plaintiff further contends that other employees were not disciplined or counseled for safety violations, particularly second-shift employees who would routinely violate safety regulations when management employees were absent. She contends that in contrast to Vallieu's lax attitude toward other employees' problems, he "actively solicited" complaints about Plaintiff's performance from supervisors and shift leaders. Pl.'s Resp. at 20–21. Vallieu admitted in his deposition that he asked employees with whom he had discussed Plaintiff's performance to document their conversations. Vallieu Dep. 46–47. He explained that he made the requests because of "a pattern of discussion and concern" relating to Plaintiff's training performance. *Id.*

Apparently in response to Vallieu's request, he received three emails on February 21, 2008 from John Oldani, a training coordinator, Mark Gwizdala, a training supervisor at the latex plant, and Cheryl Conner, another manager, documenting concerns about Plaintiff's performance that they had earlier discussed with Vallieu. At approximately the same time the e-mails were solicited and sent, Vallieu was discussing Plaintiff's performance in the training program with Monica Baumgarth, a human resources representative. He told Baumgarth that her slow progress on the training program, disinterested attitude, and her repeated statements to supervisors that she was routinely exposed to chemicals necessitated a move out of the latex plant. Baumgarth Decl. ¶ 5; Vallieu Dep. at 107. By February 20, 2008, Baumgarth agreed and an employee review meeting was convened to determine whether terminating her employment was appropriate.

On the morning of February 25, 2008, the day the review meeting was scheduled to occur, Plaintiff met with Robb and reiterated her complaints about unequal treatment based on her gender. According to Robb's handwritten notes, she stated that the job was the "easiest" she had ever had, and the training issues were caused by the male employees' refusal to train a woman. Robb Dep. Ex. 53. Robb called Baumgarth and the review meeting was postponed until March 7, 2008 so that Baumgarth and investigator Michael Dizer could look into Plaintiff's complaints. Def.'s Mot. at 12–13. Dizer concluded Plaintiff's allegations lacked merit, and the March 7, 2008 review meeting went forward as scheduled. The five-member panel, which included an attorney, a neutral manager, Baumgarth, Vallieu, and Carrie Storer, unanimously concluded Plaintiff's employment should be terminated before the end of her union probationary period. *Id.* at 12. Vallieu delivered the termination letter to Plaintiff on March 12, and offered to provide her with eighteen months of company paid healthcare if she would sign a waiver. She refused and was terminated effective March 31, 2008.

## II

A motion for summary judgment should be granted if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). The party seeking summary judgment has the initial burden of informing the Court of the basis for its motion, and identifying where to look in the record for relevant facts "which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the opposing party who must "set out specific facts showing a genuine issue for trial." Fed. R. Civ. Pro. 56(e)(2); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250

(1986).  If the opposing party fails to raise  genuine issues of fact and the record indicates the moving party is entitled to judgment as a matter of law, the court shall grant summary judgment. *Anderson*, 477 U.S. at 250.

The Court must view the evidence and draw all reasonable inferences in favor of the non-moving party and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).  The party opposing the motion may not "rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact" but must make an affirmative showing with proper evidence in order to defeat the motion.  *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989).  A party opposing a motion for summary judgment must designate specific facts in affidavits, depositions, or other factual material showing "evidence on which the jury could reasonably find for the plaintiff."  *Anderson*, 477 U.S. at 252.

## A

Plaintiff's complaint alleges that Defendant's decision to terminate her employment was based on her gender, in violation of ELCRA and Title VII.  Title VII makes it unlawful for an employer to "discharge any individual, or otherwise to discriminate against any individual with respect to [her] . . . sex . . . ."  42 U.S.C. §2000e-2(a)(1).  ELCRA similarly prohibits the discharge of an employee based on his or her sex.  Mich. Comp. Laws § 37.2202(1)(a).

A Plaintiff can establish a claim for unlawful discrimination under both ELCRA and Title VII either by producing direct evidence that a materially adverse employment decision resulted from intentional discrimination or by presenting a prima facie case of discrimination under the *McDonnell Douglas Corp. v. Green* burden shifting framework.  411 U.S. 792, 802–03 (1973).  Plaintiff does

not allege that there is any direct evidence that Defendant terminated her employment because of her gender. Accordingly, she must proceed according to the *McDonnell Douglas* paradigm.[3]

First, Plaintiff must demonstrate that the decision to terminate her employment was based in part on her gender. She can do so by demonstrating she is a member of a protected class, she was subject to a materially adverse employment action, she was qualified for the job, and that she was replaced by an employee who was not a member of the protected class or, alternatively, that similarly situated employees from outside the protected class were treated more favorably. *Vincent v. Brewer Co.*, 514 F.3d 489, 494 (6th Cir. 2007); *Humenny v. Genex Corp.*, 390 F.3d 901, 906 (6th Cir. 2004). If she succeeds in demonstrating a prima facie case, the burden shifts to the employer to present legitimate nondiscriminatory reasons for the adverse employment decision. *Vincent*, 614 F.3d at 494; *see also McDonnell Douglas*, 411 U.S. at 802–05. Finally, the burden returns to the plaintiff, who must show that the employer's proffered reasons for the decision were pretextual. *McDonnell Douglas*, 411 U.S. at 802–05; *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254–55 (1981). Despite the burden shifting test, the ultimate burden of proving discrimination on the basis of gender remains at all times with the Plaintiff. *See Burdine*, 450 U.S. 248.

Defendant concedes, for the purposes of the motion, that Plaintiff is a member of a protected class, she suffered a materially adverse employment action when she was terminated from her job, and that prior to her termination, she was qualified for the position. Defendant maintains, however,

---

[3] Because the *McDonnell Douglas* framework for analyzing employment discrimination cases applies both to Title VII claims and ELCRA claims, it is appropriate to consider them together at the summary judgment phase. *Thomas v. Hoyt, Brumm & Link, Inc.*, 910 F. Supp. 1280, 1286 (E.D. Mich. 1994) (citing *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992)); *see also Lytle v. Malady*, 458 Mich. 153, 172–73 (1998) (applying *McDonnell Douglas* in an ELCRA gender discrimination case).

that it is nevertheless entitled to summary judgment on Plaintiff's gender discrimination claims because Plaintiff has not identified a similarly situated male employee who was treated differently, and even if she had, she cannot show that Defendants' legitimate nondiscriminatory reasons for ending her employment were pretextual.  Def.'s Mot. at 14.

Plaintiff's response focuses on her retaliation claims and does not address Defendant's motion with regard to her discrimination claims.  Plaintiff alleges in her complaint, however, that she is similarly situated to Mike Monville, a male employee who was hired into the fast track program at the same time as Plaintiff and assigned to the latex plant upon completion of the fast track training.  To establish that she was similarly situated to Monville, Plaintiff must demonstrate that "all relevant aspects" of their employment situations are "nearly identical." *Humenny*, 390 F.3d at 906 (citations and quotations omitted).  Plaintiff must show that she and Monville "dealt with the same supervisor, [were] subject to the same standards, and engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or their employer's treatment of them for it." *Id.*

Here, Monville and Plaintiff had very similar employment situations.  They started with Defendant at the same time, were assigned to the same training group, and were later designated to work in the same plant.  Plaintiff and Monville apparently reported to the same supervisors, although they received guidance from different trainers, and for a time, they worked the same shift.  However, as Defendant emphasizes, Monville is still not similarly situated because Plaintiff has not presented any evidence that he "fail[ed] to follow [Defendant's] safety protocols, resist[ed] instruction, [or] lack[ed] initiative."  Def.'s Mot. at 14.  Indeed, Plaintiff has not offered any evidence that Monville's performance was deficient in any way.  Her attorney has challenged the assertions of her

supervisors concerning her performance, but she has offered no evidence to support the discrimination claims. It is acknowledged by Defendant that she generally did well on the classroom portions of the training, but her on-the-job skills developed slowly and by her own admission included numerous chemical spills. There is no evidence that Monville had a similar problem with chemical spills or that his supervisors and trainers were concerned with the progress of his on-the-job training. Accordingly, she has not presented a prima facie case that the decision to terminate her employment was motivated by her gender.

To prevail on her gender discrimination claim, Plaintiff either needs direct evidence that Vallieu and the rest of the review committee made the decision to terminate her employment based in part on her gender, or in the alternative, she needs to demonstrate that she was treated differently by Vallieu than a similarly situated male employee. Although both Plaintiff and Monville started in the plant at the same time and worked similar jobs, she has not demonstrated that they are similarly situated. Additionally, there is no direct evidence of discrimination. Accordingly, Plaintiff has not presented a prima facie case of gender discrimination in violation of Title VII or ELCRA.

**B**

Plaintiff's Complaint also alleges that Defendant violated Title VII by subjecting her to a hostile workplace because of her gender.[4] Plaintiff alleges she was subjected to a hostile environment because her initial trainer told her it was a "waste of time" to train women because women were physically incapable of doing the job; her initial supervisor indicated that men in the latex plant had been rejecting women for years; she was frequently cursed at by men in the plant,

---

[4] ELCRA does not apply to gender-based hostile work environment claims. *Haynie v. Michigan*, 468 Mich. 302 (2003). The hostile environment must be "sexual in nature" to be actionable under ELCRA. *Id.* at 305, 310.

-14-

who called her and the only other woman in the plant a "bitch" or a "fucking woman"; and the only other female process operator in the plant was derided for being "on the rag."  Plaintiff has also provided evidence demonstrating that the latex plant employed an all-male workforce in the years proceeding Plaintiff's employment and again after her termination.

Defendant disputes Plaintiff's factual allegations and contends that, even if they are true, the offending comments were not so pervasive or offensive that they create "an environment that a reasonable person would find hostile or abusive." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21–22 (1993).  "[M]ere utterance of an . . . epithet which engenders offensive feelings in an employee" does not implicate Title VII.  *Id.* (citations and quotations omitted).  Defendant further argues that Plaintiff admitted in her deposition that she was not subjectively bothered by the conduct of her coworkers.  *See* Pl.'s Dep. at 150.

A hostile work environment claim under Title VII requires a showing of severe and pervasive abuse that is both subjectively and objectively offensive.  *Harris*, 510 U.S. at 21–22. Although Plaintiff has not specifically addressed Defendant's motion for summary judgment as to her hostile workplace claim, she has presented sufficient factual information to survive Defendant's motion for summary judgment.  As detailed above, she was subjected to cursing and derogatory comments because she was a woman.  Her supervisor suggested on her first day at the latex plant that it was a difficult place for women.  The only other woman who worked there at the same time as Plaintiff also had a difficult time, and has since transferred.  Currently, no women work in the latex plant.  Most persuasively, Williams told Plaintiff early on that training her would be a waste of time because she was a woman.  Plaintiff's assertion is supported by Monville's deposition testimony that Plaintiff was "visibly upset" her first day at the latex plant.  He stated: "You know,

her first day on shift I recall her coming down. She was upset and said that she felt that [Williams] hated women. I asked her why. I don't recall the reasoning behind it or a specific reason." Monville Dep. at 22–23.

Defendant contends that even if all of Plaintiff's assertions about working conditions in the plant were true, the hostile work environment claim should be dismissed because she admitted in her deposition that she was not subjectively bothered by the conduct of male employees. Def.'s Mot. at 18. Indeed, the conditions must be both objectively and subjectively hostile to succeed on a hostile work environment claim under Title VII. *Harris*, 510 U.S. at 21. At her deposition, Plaintiff was asked "So, in your mind, you thought you were doing – were things fine for you in the latex plant up until you got exposed to chemicals?" Pl.'s Dep. at 150. She responded:

> It wasn't the best working environment but, yeah, everything was fine. I mean, I was doing good, I was passing my tests, I was learning, I was studying, I was comprehending a lot of material because there's a lot to learn out there and I felt like everything was going good, yeah.

*Id.* Although Plaintiff's testimony may be some evidence she did not believe the conditions were hostile, taking the record as a whole, it does not preclude a reasonable jury from concluding that the conduct of Defendant's employees was objectively hostile and that Plaintiff's testimony reflects her best effort to bear up under the circumstances.

A reasonable jury could conclude that she was subjected to "harassment [that] unreasonably interfered with [her] work performance or created a hostile or offensive work environment that was severe and pervasive." *Fenton v. HiSAN, Inc.*, 174 F.3d 827, 829–30 (6th Cir. 1999). Although there is little evidence to support her claims beyond her own testimony and the supporting information in the depositions of Monville and Murray, it is enough to create a question of fact for the jury.

It is also worth noting, as Defendant emphasizes in its reply, that Plaintiff did specifically address the hostile work environment claim in her response to Defendant's motion for summary judgment. Rather, she focuses exclusively on her retaliation claims, and, in Defendant's words, "abandon[s]" her other claims. Def.'s Reply at 3. While it is true that she does not present legal argument in regards to her discrimination claims, she has provided a substantial number of facts to support those claims. An inartfully drafted response does not preclude recovery.

## C

Plaintiff also alleges that Defendant terminated her employment in retaliation for exercising her rights under Title VII, ELCRA, and the WDCA. 42 U.S.C. § 2000e-3(a); Mich. Comp. Laws §§ 37.2701(a), 418.301(11). Retaliation claims, like discrimination claims, are evaluated pursuant to the *McDonnell Douglas* framework.

## 1

The WDCA provides the exclusive remedy under Michigan law for a qualified employee who is injured on the job to be compensated by his or her employer. Mich. Comp. Laws §§ 418.101–.941. Indeed, an employee injured on the job is entitled to payment from his or her employer regardless of fault. Mich. Comp. Laws § 418.301(1). The statute further provides that an employer "shall not discharge an employee or in any manner discriminate against an employee . . . because of the exercise by the employee on behalf of himself of herself or others of a right afforded by" the WDCA. Mich. Comp. Laws 418.301(11). The only issue raised by Defendant's motion is whether Plaintiff exercised, on behalf of herself, a right afforded by the WDCA. It is undisputed that Plaintiff verbally informed her supervisors that she believed her January 2008 illness resulted from the January 10, 2008 oil spill in the latex plant. The question is whether an employee who

verbally informs her employer of an on the job injury has exercised a right afforded by the WDCA.

Defendant contends that providing an employer with notice of injury is not enough to constitute an exercise of rights under the WDCA. Defendant relies principally on two Michigan Court of Appeals cases decided twenty years ago. In the first, *Wilson v. Acacia Park Cemetery Ass'n*, 162 Mich. App. 638 (1987), the plaintiff was a grounds keeper for the defendant who injured his back in April 1980 in the course of his duties as a volunteer fireman. *Id.* at 640–41. The injury, although completely unrelated to his employment, left him unable to perform his job duties. He was notified by the defendant in July 1981 that his employment had been terminated. *Id.* He filed a grievance with the union, which led to an arrangement providing for evaluation of his fitness to return to work by three physicians—one of his choosing, one of the defendant's choosing, and one neutral physician—to determine whether he was medically fit to return to work. *Id.* Two of the three physicians concluded he was not fit for work. *Id.* He then filed suit alleging, inter alia, that his employment was terminated in retaliation for "anticipated future workers' compensation claims." *Id.* The trial court dismissed the claim, and the Michigan Court of Appeals affirmed, concluding that "retaliatory discharge premised upon the employer's anticipation of a future claim does not state a legally cognizable cause of action." *Id.* at 645.

In the second case, *Griffey v. Prestige Stamping, Inc.*, 189 Mich. App. 665 (1991), the plaintiff filed a seven-count complaint largely claiming that he was terminated without just cause in violation of a collective bargaining agreement. *Id.* at 666. The Michigan Court of Appeals upheld dismissal of six of the counts because they were preempted by the Labor Management Relations Act. 29 U.S.C. § 185(a). The court also upheld dismissal of a WDCA retaliation claim

because Plaintiff filed his workers compensation claim after he filed the retaliatory discharge claim. *Id.* at 667–68. The Court reached its conclusion in reliance on *Wilson* without accounting for the fact that the *Wilson* plaintiff was not injured on the job. *Id.* It is not clear from the facts related by the appellate court whether or not the plaintiff informed the defendant that he was injured on the job before his employment was terminated.

The rule from *Griffey* and *Wilson* creates an unusual incentive for employers to terminate employees immediately after they are injured in order to avoid liability for retaliatory discharge under the WDCA. As the Michigan Court of Appeals recognized in a recent case, the WDCA does not prohibit retaliation against an employee for filing a workers compensation claim, it prohibits retaliation for exercising a right afforded by the WDCA. *Howe v. World Stone & Tile*, No. 275442, 2008 WL 2262175, at *2 n.7 (Mich. Ct. App. Jun. 3, 2008). The requirement that a claim be filed before an action for retaliation can be maintained developed by judicial decision and not based on the text of the statute. The *Howe* court suggested, for example, that a request for medical treatment following a work-related injury may be enough to constitute the exercise of a right afforded by the WDCA. *Id.* However, the *Howe* court's recent discussion was confined to a footnote and was not relied on by the court in reaching its conclusion. Accordingly, the rule in Michigan still requires an employee to file a claim for workers compensation before she is terminated or no action for retaliatory discharge is available under the WDCA. An employee who at the time of the adverse employment action has done nothing more than provide oral notice to her employer that she believes she was injured on the job has not exercised a right afforded by the WDCA. *See Vettese v. Jacobson Stores, Inc.*, No. 222508, 2001 WL 951742, at * 3 (Mich. App. Ct. Aug. 21, 2001); *Zimmerman v. Comprehensive Health Servs., Inc.*, No. 207280, 1999 WL 33438834, at *2 (Mich. Ct. App. Jul. 9,

1999).

Because there is no genuine issue of material fact as to whether Plaintiff exercised a right afforded by the WDCA, Defendant is entitled to summary judgment on the WDCA retaliation claim.

**2**

Plaintiff also alleges that she was discharged in part for complaining to her employer about gender discrimination in violation of Title VII and ELCRA.[5]  To establish a prima facie case of retaliation under Title VII and ELCRA, Plaintiff must demonstrate that she engaged in a protected activity, her employer knew of the activity, the employer subsequently terminated plaintiff's employment, and that the protected activity was a motivating factor in the decision to end the employment.  *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992); *Booker*, 879 F.2d at 1311.  Defendant contends that there is insufficient evidence of a causal link between the Plaintiff's February 25, 2008 complaint about gender discrimination and the March 7, 2008 decision to terminate her employment.  Plaintiff responds that the proximity in time coupled with the evidence of gender discrimination she has provided, are enough to establish a genuine issue of material fact as to whether her complaints about gender discrimination motivated Defendant's decision to terminate her employment.

On February 20, 2008 Vallieu and Baumgarth met and decided to convene an employee review meeting to evaluate Plaintiff's performance and determine whether to retain her as an employee beyond the union probationary period.  The review meeting was scheduled for February 25.  On that date, Plaintiff met with Robb in the morning and reported that she was being

---

[5] The anti-retaliation provisions in ELCRA and Title VII are remarkably similar and "should be construed in the same manner."  *Booker v. Brown & Williamson Tobacco, Inc.*, 879 F.2d 1304, 1312 (6th Cir. 1989).  Accordingly, the claims will be considered together.

discriminated against on the basis of her gender. Specifically, she cited Williams' refusal to train her and Vallieu's disciplinary e-mails as examples. Plaintiff asserts that she had previously raised concerns about gender discrimination with Robb on February 4, 2008, and with other latex plant employees on several occasions. The review meeting was postponed until March 7 while Defendant investigated Plaintiff's allegations of discrimination. Defendant concluded the allegations were unfounded, and Plaintiff's employment was terminated following the March 7 review meeting. Defendant contends that because the decision to convene a review meeting was made before the reports of gender discrimination were provided to Robb on February 25, the reports could not have been a motivating factor in the decision to terminate her employment.

Plaintiff, on the other hand, contends that the timing of the decision to terminate her employment coupled with the supporting facts contained in her deposition testimony are enough to establish an inference of causation. *See Chandler v. Specialty Tires of Am.*, 283 F.3d 818, 826 (6th Cir. 2002) ("Proximity in time can raise a prima facie case of retaliatory discharge. But proximity alone may not survive summary judgment, nor does it necessarily imply causation." (citations omitted)); *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 582–83 (6th Cir. 2000) (noting "temporal proximity alone does not support an inference of retaliatory discrimination in the absence of other evidence," but closeness in time is relevant). Plaintiff further contends that the February 25 report to Robb was not the first time she alleged violations of Title VII. It was simply the first time Defendant responded to her allegations. Plaintiff has presented sufficient evidence of causation to establish a prima facie case of retaliation.

First, the decision to terminate her employment was made approximately two weeks after she reported harassment. The temporal proximity in the events cannot be ignored. The fact that the

decision to convene the review meeting had already been made when she formally reported the harassment to Robb supports Defendant's position, but it is not dispositive. If, as Defendant repeatedly asserts, the review meetings are more than a mere rubber stamp on a manager's decision, meaningful review of Plaintiff's continued employment occurred two weeks after she reported harassment. Moreover, Plaintiff's assertion that she reported harassment to managers on several prior occasions contradicts the factual contentions in Defendant's motion.

Second, the Title VII complaint was directed, in part, at one of the people who participated in the decision to terminate her employment, Vallieu, and the decision to terminate her employment was based in large part on his evaluation of her performance. It was Vallieu who informed the committee of the alleged training problems, and Vallieu who related the complaints of other latex plant employees to the committee. It was also Vallieu's February 19, 2008 e-mail that was the subject of Plaintiff's Title VII complaint. Accordingly, a reasonable jury could conclude that Vallieu fabricated performance problems to convince the committee to terminate Plaintiff's employment.

Third, Plaintiff received positive feedback as late as January 8, 2008, two days before she left work for an extended medical absence, and less that two months before the decision was made to terminate her employment. Criticism, on the other hand, does not appear in the record until January 10, 2008. While that is still several weeks before she complained to Robb about gender-based harassment, it is nearly five months after she began her employment with Defendant. The rapid change between positive and negative commentary supports the inference that her reports of gender discrimination could have  motivated the decision to end her employment.

Fourth, the decision to terminate her employment was based on alleged deficiencies in her

training performance, which itself was the result of the alleged biases of her trainers. *See Summer v. Goodyear Tire & Rubber*, 427 Mich. 505, 545 n.17 (1986) (noting that "there is support for the proposition that an employer cannot use an employee's diminished work performance as a legitimate basis for removal where the diminution is the direct result of the employer's discriminatory behavior) *overruled in part of other grounds by*, *Garg v. Macomb County Mental Health Servs.*, 473 Mich. 263 (2005). On February 25, Plaintiff complained to Robb that the men in the latex plant refused to train her because she was a women. On March 7, her employment was terminated based on training issues reported to the company by the same men who allegedly refused to train her. Assuming her allegations are true, they support the inference that her reports of gender discrimination motivated the decision to terminate her employment.

Defendant asserts that it had a legitimate reason to terminate plaintiff's employment. Namely, she exhibited a lack of initiative and ability to complete the training program. Accordingly, the burden shifts back to Plaintiff to demonstrate the proffered reason is pretextual. "[A] plaintiff can show pretext in three interrelated ways: (1) that the proffered reason has no basis in fact, (2) that the proffered reasons did not actually motivate the employer's action, or (3) that they were insufficient to motivate the employer's action." *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 (6th Cir. 2009). The test, though, should not be applied mechanically. *Id.* 400 n.4. The key question is whether a jury could reasonably reject Defendant's proffered reasons for terminating Plaintiff. *Id.*

Defendant asserts that it terminated Plaintiff's employment because of her alleged training problems, specifically, that she showed a lack of interest in training, she was unprepared for skills tests, she admitted a history of mishaps in handling chemicals, and she often exhibited a lack of

attention and interest to the information provided by her trainers. A reasonable jury could reject Defendant's proffered reason for many of the same reasons they could infer a retaliatory motive. Those reasons include the temporal proximity between the report of gender discrimination and the decision to terminate Plaintiff's employment, the apparent reversal from positive to negative job performance commentary when Vallieu became Plaintiff's supervisor in early January, and the conflicting interests of the employees who were involved in evaluating her performance. Plaintiff contends that the same employees who were evaluating her performance were discriminating against her. The decision to terminate her employment was allegedly based on those evaluations. A reasonable and logical inference from these facts is that her performance was not the real reason she was terminated. *Chen*, 580 F.3d at 400.

### III

Accordingly, it is **ORDERED** that Defendant's motion for summary judgment [Dkt. # 31] is **GRANTED IN PART AND DENIED IN PART**.

It is further **ORDERED** that Plaintiff's WDCA claims and Title VII and ELCRA discrimination claims are **DISMISSED WITH PREJUDICE**. A triable issue of fact exists as to the Title VII hostile work environment claim and the Title VII and ELCRA retaliation claims.

s/Thomas L. Ludington
THOMAS L. LUDINGTON
United States District Judge

Dated: April 28, 2010

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on April 28, 2010.

s/Tracy A. Jacobs
TRACY A. JACOBS